67997. CARSWELL v. THE STATE.

BENHAM, Judge.

This appeal is from appellant's conviction of three counts of homicide by vehicle.

The indictment stated that appellant caused the deaths of W. J.

Gay and his two minor granddaughters through violation of former Code Ann. § 68A-901, reckless driving (replaced by OCGA § 40-6-390), and former Code Ann. § 68A-902, driving with ability impaired by alcohol (replaced by OCGA § 40-6-391). The State presented evidence showing that on December 23, 1981, at approximately 7:30 p.m., Mr. Gay and his granddaughters were leaving the Rockdale Grocery, which Gay owned and operated, when they were struck and killed by appellant's automobile. There were no witnesses to the incident, which occurred after dark. A Georgia State Patrol investigator who reconstructed the accident at the site of impact testified that appellant's car appeared to have left the highway, entered the grocery parking lot, and struck the victims before they entered Gay's parked Volkswagen van. The officer's opinion was based on the position of and damage to the vehicles, the location of and injuries to the victims' bodies, and the fact that the ignition key of the van was in the "off" position. Both the investigating officer and the coroner, who arrived later at the scene of the collision, observed hair, flesh, and blood on the front and grille of appellant's automobile. They also noticed several beer cans, two broken whiskey bottles, and some small Christmas gifts inside appellant's car.

Appellant, who has one artificial eye, suffered injuries to his head and sighted eye, but was able to walk from his automobile to his sister's car to be transported to the hospital. The investigating officer, who testified that he had detected "the odor of some kind of alcoholic beverage coming from his car or his person or somewhere in there," ordered the emergency room physician to perform a blood alcohol test on appellant. The officer did not place appellant under arrest at that time, nor did he advise appellant, or his wife and sister, who were present, of his right to refuse such a test or to have an independent chemical analysis made.

Appellant testified that he came home from work about 5:00 p.m. on the day in question, played with his children, and then went to install a carpet at the home of his mother-in-law. After that he picked up some Christmas gifts, including two bottles of whiskey, visited a friend, and at 7:30 p.m. was on his way home. He swore that he had drunk two 16-ounce cans of malt liquor during this period but was not intoxicated. As he approached the Rockdale Grocery, he saw out of the corner of his eye a vehicle entering the highway from the parking lot. He swerved into the gravel lot in order to miss the van, but struck it broadside. He saw no lights from the van and did not see the victims. Appellant stated that he never lost consciousness, although he was unable to see because of blood from the injury to his eye, and that while he was being treated, sutured, and bandaged, he was at all times communicating with the emergency room personnel.

Appellant's testimony was corroborated by several eyewitnesses,

and both the treating physician and the emergency room technician stated that they detected no odor of alcohol about appellant's person and observed no confusion in his speech. Several other witnesses who were with appellant prior to the collision testified that he did not act or appear intoxicated. However, the coroner and the technician who withdrew his blood noticed the odor of alcohol and appellant's impaired ability to answer questions. The trial court denied appellant's pre-trial motion to suppress the blood test results, and the State was allowed to show that his blood was analyzed by the state crime lab at .13 milligrams alcohol content. The trial court also allowed in evidence, over objection, the three victims' death certificates, in which the coroner had listed "auto struck pedestrian" as the cause of death. After his conviction and the denial of his motion for new trial, appellant brought this appeal.

1. OCGA § 40-6-392 sets out the step-by-step procedures for the introduction of evidence of the amount of alcohol or drugs in a person's blood at the trial "of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person" in violation of Code Section 40-6-391. In order for the chemical analysis "to be considered valid [it] shall have been performed according to methods approved by the Division of Forensic Sciences of the Georgia Bureau of Investigation and by an individual possessing a valid permit issued by the Division of Forensic Sciences for this purpose." OCGA § 40-6-392 (a) (1). Further, the person being tested is entitled to have a qualified person of his own choice administer an additional chemical test and must be advised by the arresting officer at the time of his arrest of his right to do so, or may refuse to permit any test to be made. OCGA § 40-6-391 (a) (3) and (4), and (c).

a. Appellant contended in his motion to suppress the results of his blood alcohol test that he was never advised of his right to refuse the test or to have an independent chemical analysis. The officer admitted that he did not so advise appellant, but claimed he was justified in not doing so because he thought appellant was unconscious at the time he ordered the test. It is true that "[i]f a suspect is 'dead, unconscious, or otherwise incapable of refusing the test . . . the officer lawfully can extract a blood specimen under the aegis of protection of evidence' without advising the suspect of his rights concerning intoxicant tests. [Cits.]" Rogers v. State, 163 Ga. App. 641 (1) (295 SE2d 140) (1982). The evidence simply does not support a finding that this was the case here.

Appellant was undeniably conscious when taken to the hospital to be treated after the accident. While he was being treated and questioned by a doctor and other emergency room personnel with his wife and sister present, the investigating officer arrived and began interrogating appellant and his wife. The attending physician testified that

at that time appellant appeared alert and was able to talk and answer questions. Although appellant had a glass eye and his injured eye was bandaged, the officer testified that he thought appellant was drifting in and out of consciousness because "his eyes kept closing [and] I knew one of them was hurt . . . [A]t times what he was saying was real clear, the little bit he said to me. It just seemed like he was so droggy [sic], you know, that he wanted to sleep more than he did talk. But when I would ask him something, his answer would be clear . . ." However, the officer explained that he did not attempt to advise appellant of his implied consent rights when he asked the doctor to draw the blood, because "it appeared to me that I would have had to kept waking him up for him to [have] understood it, and then if he would have ever understood it, I wouldn't have known, you know."

This was not a situation such as that in *Smith v. State*, 143 Ga. App. 347 (238 SE2d 698) (1977), where the defendant was at best "semi-conscious and not communicating with persons present." In fact, appellant knew that a blood sample was being drawn, but was unaware that it was taken for any purpose other than ordinary medical procedure. However, even though the officer was cognizant of the statutory obligations, he at no time made any effort to ascertain from the trained medical personnel present appellant's capacity to refuse the test or to apprise appellant of his rights in that regard.

Since we find the evidence of appellant's consciousness to be overwhelming, we agree that the blood test results should not have been admitted in evidence. "[W]here a law enforcement officer requests a person to submit to a chemical test because of acts alleged to have been committed while operating a motor vehicle under the influence of alcohol or drugs, and the officer arrests that person on this ground, OCGA § 40-6-392 (a) (4) . . . requires that the officer inform him *at the time of arrest* of his right to an independent chemical analysis to determine the amount of alcohol or drugs present in his blood . . . or at a time as close in proximity to the instant of arrest as the circumstances of the individual case might warrant, [or] the results of the state-administered test will not be admissible at trial to show that the accused was driving under the influence of alcohol or drugs." *Perano v. State*, 250 Ga. 704, 708 (300 SE2d 668) (1983). Not even "substantial compliance with the provision as to additional tests [will] compensate for the total failure to advise the defendant at any time of his right to a [chemical] analysis." *Hulsey v. State*, 138 Ga. App. 221, 222 (225 SE2d 752) (1976). The question of the admissibility of such evidence is a question for the trial court and not the jury. *Beaman v. State*, 161 Ga. App. 129 (3) (291 SE2d 244) (1982). Admission of the results here, showing a level of alcohol creating a legal presumption of intoxication, was harmful to appellant and, in view of the absence of statutory compliance, was reversible error.

b. In view of our ruling on the inadmissibility of appellant's blood analysis, it is not necessary for us to consider the enumeration concerning the equipment or procedures used for the blood alcohol test. See *State v. Chumley,* 164 Ga. App. 828 (299 SE2d 564) (1982).

2. We also find meritorious appellant's contention that the trial court erred in admitting over objection the victims' death certificates, which stated the opinion of the coroner that the deaths occurred when an "auto struck pedestrian." Appellant did not complain about the entries on the certificates concerning the facts of the deaths and the injuries, but asserts that the statements that the victims were pedestrians at the time they were struck were merely personal conclusions as to the events leading to the deaths. The State argues that since the coroner had previously testified as to his personal observations at the scene of the incident, the statements were admissible based thereon.

The rule in this regard is that "a death certificate serves as prima facie evidence only of (1) the death itself and (2) the immediate agency of the death. Other conclusions, such as those regarding the events leading up to the death or whether the cause of death was intentional or accidental, are not admissible." *King v. State,* 151 Ga. App. 762 (2) (261 SE2d 485) (1979). Accord *Security Life Ins. Co. v. Blitch,* 155 Ga. App. 167 (2) (270 SE2d 349) (1980). In our view, the statements that the victims were pedestrians were based upon conclusions as to events leading up to the victims' deaths and therefore should have been excluded upon objection. We need not determine whether this constituted reversible error, or was merely cumulative of other properly admitted evidence as the *King* court decided, but this ruling confirms the inadmissibility of these conclusions in the event of a new trial.

3. We likewise recognize the validity of appellant's challenge to the allowance of certain opinion testimony of the emergency room physician on grounds that a proper foundation was not laid to qualify him as an expert in the field of toxicology, and that the appellant was not shown to be an habitual drinker within the context of the hypothetical question posed by the State. Again, however, we do not deem the error to have been so prejudicial as to require reversal standing alone, and do not anticipate its reoccurrence upon retrial.

4. In presenting his case, appellant called a witness who testified that he had known W. J. Gay since 1969, had traded at his store, and had often seen Gay leave the parking area where the collision occurred. When asked what Gay's habitual method of driving away from the store was, this witness answered that Gay "would usually have his truck parked up there at the front of the store and most of the time he wouldn't go straight out and turn to come back the other way; most of the time he would back out and then go back towards

. . . he went down a dirt road towards his house. And he would go back the other way after he backed out." The State objected to this testimony, and although defense counsel argued that it was presented solely to establish "a pattern of behavior," the trial court ruled that such evidence was inadmissible because of remoteness and instructed the jury to disregard the testimony. Appellant asserts that evidence of habitual carelessness is admissible when relevant to an issue in the case, i.e., his defense that Gay's van suddenly entered the highway in front of him, and that the collision occurred when he swerved into the parking lot to miss it.

"Generally, evidence of a decedent's negligence in previous, isolated instances is not admissible as bearing on negligence at the time of death. [Cit.] Likewise, evidence of negligence in doing certain acts is not admissible when the decedent was not doing those acts at the time of death. [Cit.] And evidence of the decedent's *character* for negligently performing certain acts is not admissible, even when the decedent was performing those acts at the time of death. [Cit.] However, evidence of a party's *habitual* carelessness, recklessness, or negligence in performing particular acts would be admissible where death ensued from such acts. [Cit.]" *Stripling v. Godfrey*, 143 Ga. App. 742 (2) (240 SE2d 145) (1977). Accord *Sams v. Gay*, 161 Ga. App. 31 (1) (288 SE2d 822) (1982). The probative value of evidence as to such fixed and uniform habits is for the jury, and the rule is applicable to criminal cases. See *Daniel v. State*, 130 Ga. App. 548 (2) (203 SE2d 736) (1974).

Contrary to the ruling of the trial court that any testimony as to Gay's pattern of driving should be excluded for remoteness, we think evidence of his "hazardous habit was relevant to a factual consideration of whether negligence on [his] part contributed to [his] death." *Stripling v. Godfrey*, supra, p. 743. On cross-examination the investigating officer revealed that he could not remember whether he saw the ignition key in the "off" position in the van before it was moved from the scene, and that he did not check the vehicle to determine what gear it was in. He also conceded that there was no way he could know from his reconstruction of the collision whether the van was moving at the moment of impact. While the officer concluded that the van was not moving when struck by appellant's automobile, there was no direct proof of how the collision occurred. In such a case, and particularly where such evidence is pertinent to the defendant's primary defense to the charges against him, we find it a better practice to allow "evidence that a person habitually did a particular thing in a particular manner . . . to prove that the person acted in accordance with that habit on a given occasion." *Sams v. Gay*, supra, p. 32.

5. It follows that the trial court's refusal to give appellant's requested charge to the jury on the defense of accident also unfairly

hampered his attempt to prove his theory of defense, that he swerved off the road in an attempt to avoid hitting the van but was unable to do so. Such a charge on accident or misfortune (OCGA § 16-2-2) was approved in a vehicular homicide case in *Smith v. State*, supra, Division 2, and is not inapposite as contended by the State. It is error to fail to charge on this defense, whether it is the sole defense, the controlling issue, or one of the main theories of defense if the issue is raised by the evidence, and "[a] defendant's testimony is sufficient to raise a jury question. [Cit.] . . . Regardless of the belief of this court as to the viability of that defense, and regardless of what the trial judge thought of the credibility of that defense, the jurors are the exclusive finders of fact and judges of credibility of witnesses. [Cit.] A trial judge invades the province of the jury when he withdraws an accused's sole or principal defense from the jury by his determination that it is unbelievable." *Kimbrell v. State*, 148 Ga. App. 302, 305 (250 SE2d 883) (1978).

Insofar as appellant's requested charge on mistake of fact is concerned, however, it appears that failure to instruct on that principle as enunciated in OCGA § 16-3-5 constitutes reversible error only when it is the defendant's sole theory of defense. See, e.g., *Hobgood v. State*, 162 Ga. App. 435 (291 SE2d 570) (1982); *Gray v. State*, 158 Ga. App. 582 (2) (281 SE2d 328) (1981); *Ellison v. State*, 158 Ga. App. 419 (1) (280 SE2d 371) (1981).

6. Because a new trial must be granted, it is unnecessary for us to determine, on the evidence introduced in the instant trial, whether the State failed to prove beyond a reasonable doubt appellant's guilt of the crime for which he was indicted. The present case is distinguishable in that regard from *Lewis v. State*, 248 Ga. 566 (1) (285 SE2d 179) (1981), where the Supreme Court held that "an appellate court may not ignore an enumeration of error regarding the insufficiency of the evidence to support a conviction . . . where the contention is made that the evidence is insufficient to support the verdict *even prior to the exclusion of any improperly admitted evidence.*" (Emphasis supplied.) In the present case, appellant's contention that the evidence is insufficient depends on the exclusion of evidence of his blood alcohol level. Likewise, appellant's enumeration of error in regard to introduction of improperly certified copies of purported convictions in aggravation of punishment for sentencing need not be considered, since his conviction has been reversed.

*Judgment reversed. Banke, P. J., and Pope, J., concur.*

DECIDED JULY 2, 1984.

*Richard T. Taylor, Karl Rice,* for appellant.

462

*Beverly B. Hayes, District Attorney, B. H. Baldwin, Assistant District Attorney*, for appellee.